**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

GUSTAVO GONZALEZ and WILLIAM
KANE,

             Plaintiffs,

     v.

800-FLOWERS, INC., D/B/A 1-800
FLOWERS.COM, HARRY & DAVID,
PERSONALIZATION MALL, SHARI'S
BERRIES, 1-800-BASKETS.COM, SIMPLY
CHOCOLATE, FRUIT BOUQUETS.COM,
CHERYL'S COOKIES, THE POPCORN
FACTORY, WOLFERMAN'S BAKERY,
and VITAL CHOICE,

             Defendant.

Case No. 2:24-cv-08894-SJB-JMW

**DEFENDANT 800-FLOWERS, INC.'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS
<u>PENDING ARBITRATION, OR ALTERNATIVELY, TO STRIKE CLASS CLAIMS</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     FACTS ................................................................................................................ 3

        A.      800-Flowers' Celebrations Passport Program ........................................ 3

        B.      Tiffany Brundage's Agreement to Arbitrate .......................................... 4

        C.      Anna Garr's Agreement to Arbitrate ..................................................... 7

III.    THE COURT SHOULD COMPEL PLAINTIFFS TO ARBITRATE ........................... 11

        A.      Legal Standard ..................................................................................... 11

        B.      Plaintiffs Agreed to Arbitrate ............................................................. 12

        C.      Brundage's and Garr's Claims Fall Squarely Within the Arbitration Agreement's Scope ............................................................................... 18

IV.     THE COURT SHOULD STAY THIS ACTION PENDING RESOLUTION OF THE ARBITRATION ................................................................................................. 22

V.      ALTERNATIVELY, THE COURT SHOULD STRIKE THE CLASS CLAIMS ........... 22

VI.     CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Express Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) ............................................................................................. 11

*AT&T Tech. v. Commc'n Workers*,
  475 U.S. 643 (1986) ................................................................................. 19, 21, 22

*Bassett v. Elec. Arts Inc.*,
  No. 13-CV-04208 MKBSMG, 2015 WL 1298644 (E.D.N.Y. Feb. 9, 2015) .................... 20, 21

*Bellevue v. Exxon Mobile Corp.*,
  No. 19-cv-652 (BMC) (LB), 2019 WL 1459041 (E.D.N.Y. Apr. 2, 2019) ............................ 20

*Camilo v. Uber Techs., Inc.*,
  No. 17 CIV. 9508 (AKH), 2018 WL 2464507 (S.D.N.Y. May 31, 2018) ............................... 23

*Castellanos v. Raymours Furniture Co., Inc.*,
  291 F. Supp. 3d 294 (E.D.N.Y. 2018) ...................................................................... 23

*Coenen v. R.W. Pressprich & Co.*,
  453 F.2d 1209 (2d Cir. 1972) ............................................................................. 2, 19

*Coinbase, Inc. v. Suski*,
  602 U.S. 143 (2024) ........................................................................................... 11

*Collins & Aikman Prods. Co. v. Building Sys.*,
  58 F.3d 16 (2d Cir. 1995) .................................................................................... 19

*Damon Tate, et al. v. 800-Flowers, Inc.*,
  No. 2:23-cv-04340-AB-PVC (C.D. Cal.) .................................................................... 2

*Davitashvili v. Grubhub, Inc.*,
  131 F.4th 109 (2d Cir. 2025) ................................................... 11, 12, 14, 15, 16, 18

*DDK Hotels, LLC v. Williams-Sonoma, Inc.*,
  6 F.4th 308 (2d Cir. 2021) .................................................................................. 11

*Edmundson v. Klarna, Inc.*,
  85 F.4th 695 (2d Cir. 2023) ..................................................................... 16, 17, 18

*First Options of Chi., Inc. v. Kaplan*,
  514 U.S. 938 (1995) ........................................................................................... 11

*Fujifilm N. Am. Corp. v. Geleshmall Enters, LLC*,
    239 F. Supp. 3d 640 (E.D.N.Y. 2017) ................................................ 19

*Harrington v. Atl. Sounding Co.*,
    602 F.3d 113 (2d Cir. 2010) ................................................ 11

*Himber v. Live Nation Worldwide, Inc.*,
    No. 16-CV-5001(JS) (GRB), 2018 WL 2304770 (E.D.N.Y. May 21, 2018) ......................... 16

*Hu v. Whaleco, Inc.*,
    779 F. Supp. 3d 265 (E.D.N.Y. 2024) ................................................ 16

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ................................................ 12, 14, 15, 16, 18

*Ryan, Beck & Co. v. Fakih*,
    268 F. Supp. 2d 210 (E.D.N.Y. 2003) ................................................ 19

*Schapp v. MasTec Servs. Co.*,
    No. 6:12-CV-841 (LEK/DEP), 2014 WL 1311937 (N.D.N.Y. Mar. 31. 2014) .................... 2, 19

*Shaw Grp., Inc. v. Triplefine Int'l Corp.*,
    322 F.3d 115 (2d Cir. 2003) ................................................ 19

*Smith v. Spizziri*,
    601 U.S. 472 (2024) ................................................ 22

*Starke v. Gilt Groupe, Inc.*,
    No. 13 CIV. 5497 LLS, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014) ........................ 15, 16

*Tessible "Skyler" Foster, et al. v. 800-Flowers, Inc.*,
    No. 23-cv-07441-AB-PVC (C.D. Cal.) ................................................ 2

*Tsadilas v. Providian Nat'l Bank*,
    786 N.Y.S.2d 478 (N.Y. App. Div. 1st Dep't 2004) ................................................ 23

*Vasell v. SeatGeek, Inc.*,
    No. 24-CV-00932 (NCM) (JRC), 2025 WL 240912 (E.D.N.Y. Jan. 17, 2025) ................ 18, 19

*Vitrano v. N.A.R., Inc.*,
    No. 18CV06754KAMRLM, 2020 WL 1493620 (E.D.N.Y. Mar. 27, 2020) ......................... 23

*Wu v. Uber Tech., Inc.*,
    43 N.Y.3d 288 (2024) ................................................ 11

*Zachman v. Hudson Valley Fed. Credit Union*,
    49 F.4th 95 (2d Cir. 2022) ................................................ 11

**Statutes**

9 U.S.C. § 2 ................................................................................................................ 11

9 U.S.C. § 3 ................................................................................................................ 22

N.Y. Gen. Bus. Law § 349 ............................................................................................ 1

N.Y. Gen. Bus. Law § 527-a .......................................................................................... 1

**MEMORANDUM OF LAW**

The Court should compel plaintiffs Anna Garr and Tiffany Brundage to arbitrate their claims because they contractually agreed to do so when they made several online purchases from 1-800-Flowers.com's family of brands. The Court should therefore stay this litigation pending the outcome of the arbitrations. Alternatively, the Court should strike plaintiffs' class claims.

## I.    INTRODUCTION

Plaintiffs allege that they purchased 800-Flowers, Inc.'s ("800-Flowers") Celebrations Passport, an annual membership that provides members with free standard shipping and no service charges for eligible products across 1-800-Flowers.com's family of brands. Plaintiffs allege they incurred renewal charges for the memberships to which they never agreed in violation of New York's Automatic Renewal Law, N.Y. Gen. Bus. Law ("GBL") § 527-a, and GBL § 349, yet they repeatedly used their Celebrations Passport after purchasing and paying annually for it. Indeed, Brundage continued using her Celebrations Passport benefits continuously even after she filed this lawsuit.

Putting aside whether they should pursue their claims anywhere, Brundage and Garr cannot prosecute their claims in court because they each agreed – several times – to broad arbitration provisions encompassing their claims. Each clicked checkout buttons that contained language adjacent to them clearly and conspicuously disclosing that plaintiffs agreed to hyperlinked terms by clicking the buttons. Those hyperlinks linked to terms that included a binding arbitration clause and a class action waiver.

Case after case within this judicial circuit holds that checkout pages materially identical to the ones plaintiffs completed provide reasonable notice and bind website users to the hyperlinked terms. The hyperlinks to the terms here (a) stood out from the surrounding text through underlining and different coloring compared to other adjacent text; (b) were presented uncluttered on the

purchase screen; (c) appeared directly below the checkout button; and (d) were immediately adjacent to text stating that clicking the checkout button bound the plaintiffs to the terms. And, even though they agreed to arbitration during separate purchases after purchasing Celebrations Passport (and Garr before purchasing Celebrations Passport), "the Second Circuit has held that, in the absence of language explicitly limiting an otherwise broad arbitration agreement to post-agreement disputes, the agreement should be deemed retroactive." *Schapp v. MasTec Servs. Co.*, No. 6:12-CV-0841 (LEK/DEP), 2014 WL 1311937, at *3 (N.D.N.Y. Mar. 31. 2014) (citing *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1212 (2d Cir. 1972)).

To be sure, this is not the first time that customers like plaintiffs Garr and Brundage have been injected by plaintiffs' counsel into litigation with fatal defects. In 2023 and 2024, plaintiffs' counsel filed two nearly identical cases in California against the company. In those actions, plaintiffs' counsel sued the company with a revolving roster of thirteen plaintiffs that lodged similar allegations under California law. Of those, ten dismissed their claims or otherwise removed themselves including because they either never incurred the charges underlying their claims and/or agreed to arbitrate their claims. *Tessible "Skyler" Foster, et al. v. 800-Flowers, Inc.*, No. 23-cv-07441-AB-PVC, ECF Nos. 1, 20, 45 (C.D. Cal.); *Damon Tate, et al. v. 800-Flowers*, Inc., No. 2:23-cv-04340-AB-PVC, ECF Nos. 11-1, 18 (C.D. Cal.).

Even a cursory pre-suit investigation into these plaintiffs' allegations would have revealed these fatal defects. Yet, the pattern repeated itself here. Plaintiffs Gustavo Gonzalez and William Kane initially started this litigation only to withdraw after 800-Flowers showed to those plaintiffs through their counsel that they could not pursue their claims. (Docket Entry "DE" 13; March 21, 2025, Order (holding in abeyance 800-Flowers' obligation to respond to the First Amended Complaint (DE 6) pending the filing of plaintiffs' Second Amended Complaint).) The

2

new plaintiffs, Garr and Brundage, fare no better, and the Court should compel arbitration and stay this case.  Alternatively, the Court should strike their class claims.

## II.    FACTS

### A.    800-Flowers' Celebrations Passport Program

800-Flowers is a leading floral and gift retailer focused on building its customer relationships by facilitating meaningful connections with the important people in their lives. (Jay Sweeney Declaration ("Sweeney Decl."), ¶ 2.)  800-Flowers operates websites and services across 1-800-Flowers.com's family of brands. (*See id.* at Exs. A–D; Kathleen Castellanos Declaration ("Castellanos Decl."), Exs. A–C.)  The company's goal is to establish relationships with its customers as members of a community, and offer products and services for life's many occasions. (Sweeney Decl. ¶ 2.)

In line with this goal, 800-Flowers offers its Celebrations Passport loyalty program, which is an annual loyalty membership program that provides members with certain perks across the 1-800-Flowers.com family of brands. (*Id.*; Castellanos Decl. ¶ 3.)  As plaintiffs allege, Celebrations Passport perks include "giv[ing] customers free shipping and allow[ing] customers to avoid service fees for one year for all orders made from Defendant's brands," such as "1-800-Flowers.com, Harry & David, Personalization Mall, […] Simply Chocolate, [… and] Cheryl's Cookies." (DE 14, Second Amended Complaint ("SAC"), ¶¶ 18–19; Sweeney Decl. ¶ 2; Castellanos Decl. ¶ 3.)  Thus, customers purchasing Celebrations Passport may use the program's perks on any of these and other company websites. (SAC ¶¶ 18–19; Sweeney Decl. ¶ 2; Castellanos Decl. ¶ 3.)

Plaintiffs allege they purchased Celebrations Passport subscriptions when making purchases for goods from Simply Chocolate and 1-800-Flowers, and that they incurred automatic renewal fees for the subscriptions without consenting to them in violation of New York's Automatic Renewal Law and GBL § 349. (SAC ¶¶ 4, 20, 27, 30, 33.)  Plaintiffs only seek redress

for automatic renewal charges they allege they incurred for Celebrations Passport. (*See generally* SAC.)

### B.   Tiffany Brundage's Agreement to Arbitrate

On February 4, 2021, an individual identifying herself as Tiffany White made a purchase on simplychocolate.com that included Celebrations Passport using the email address twhite0444@gmail.com, and providing a physical address in Pearl River, New York. (Sweeney Decl. ¶ 13; Castellanos Decl. ¶ 4.)  Purchasing Celebrations Passport provided benefits to 1-800-Flowers.com's family of brands including cheryls.com, 1800flowers.com, and personalizationmall.com. (SAC ¶¶ 18–19; Sweeney Decl. ¶ 2; Castellanos Decl. ¶ 3.)  Tiffany White incurred renewal fees for her membership on February 2, 2022, February 3, 2023, February 2, 2024, and February 2, 2025. (Sweeney Decl. ¶ 13.)

Shortly after the initial Celebrations Passport purchase, the same email address, physical address, and Passport benefits were repeatedly used to make dozens of purchases under the name Tiffany Brundage across 800-Flowers' websites, including cheryls.com, 1800flowers.com, and personalizationmall.com, from February 2021, to and including July 2025. (Sweeney Decl. ¶¶ 14–16, 20; Castellanos Decl. ¶ 4.)  Brundage used Celebrations Passport membership benefits when making these purchases – even after joining this lawsuit on May 22, 2025. (Sweeney Decl. ¶¶ 14, 20; Castellanos Decl. ¶ 4; SAC ¶ 19.)

Specifically, between March 2021 and May 2025, Brundage made purchases on eight separate dates, including transactions completed via PayPal on cheryls.com on May 2, 2024, and May 31, 2025, using a mobile device. (Sweeney Decl. ¶¶ 15–16.)  To do so, Brundage clicked "PayPal" as depicted in the following screenshots representative of the screens presented to her when she made her May 2, 2024, and May 31, 2025, purchases:




(Sweeney Decl. ¶¶ 16–17.)  By clicking the "PayPal" button, Brundage agreed to the hyperlinked Terms of Use on both dates.

Additionally, Brundage made dozens of purchases on personalizationmall.com – all using her Celebrations Passport benefits – on sixty-two separate occasions between February 2021 and July 2025. (Sweeney Decl. ¶ 20; Castellanos Decl. ¶ 4.)  For example, Brundage made purchases with a credit card on an iPhone on the following twelve dates:  August 25, 2024, December 18, 2024, January 11, 2025, January 13, 2025, February 2, 2025, February 23, 2025, April 7, 2025, April 17, 2025, May 10, 2025, June 5, 2025, June 30, 2025, and July 16, 2025. (Castellanos Decl.

¶ 5.)  Each time, Brundage clicked "Place Your Order" as depicted in the following screenshot representative of the screens presented to her when she made these purchases:



(Castellanos Decl. ¶¶ 5–6.)  Each of the twelve separate times Brundage clicked the "Place Your Order" button, she agreed to be bound by the hyperlinked Terms of Use.

When completing her two purchases on cheryls.com and the twelve purchases on personalizationmall.com, Brundage agreed to the Terms of Use.  The Terms of Use to which Brundage agreed when completing these two purchases state, in all-caps bold print on the first page:

> **THESE TERMS OF USE ALSO APPLY TO ALL MERCHANDING CHANNELS OF THE COMPANY AND ITS AFFILIATES INCLUDING, BUT NOT LIMITED TO, THE INTERNET, TELEPHONE, CATALOG, RADIO, TELEVISION, MOBILE DEVICE, SOCIAL MEDIA AND PARTICIPATING RETAIL STORES. BY ACCESSING ANY OF THE COMPANY MERCHANDING CHANNELS, AND ANY AREAS OF THE SERVICE, YOU AGREE TO BE LEGALLY BOUND, AND TO ABIDE, BY THESE TERM OF USE. PLEASE BE AWARE THAT THESE TERMS OF**

**USE CONTAIN A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER THAT WAIVE YOUR RIGHT TO A COURT HEARING AND JURY TRIAL.**

(Sweeney Decl. ¶¶ 18–19, Exs. C & D; Castellanos Decl. ¶¶ 8–10, Exs. A, B & C.)

The Terms of Use further broadly cover "any and all claims, disputes, controversies, actions or proceedings relating to, or arising out of, the […] sale of any and all products and services of the Company and its Affiliates" as follows:

> **Governing Law, Waiver of Jury Trial & Arbitration; CLASS ACTION WAIVER**
>
> . . .
>
> You agree that any and all claims, disputes, controversies, actions or proceedings relating to, or arising out of, the creation, production, manufacture, distribution, promotion, marketing, advertising (including oral and written statements), use of, exploitation, or ***sale of any and all products and services of the Company and its Affiliates***, through all merchandising channels, including, but not limited to, the internet, this Service, telephone, catalog, radio, television, mobile device, social medias platforms, and participating retail stores or the Content (collectively referred to as "Claims"), shall be governed by the internal substantive laws of the State of New York without regard to its conflict of laws principals and that any and all Claims shall be resolved exclusively by final and binding arbitration administered by the American Arbitration Association ("AAA") or by a state small claims court of competent jurisdiction over the Claim and the parties.

(Sweeney Decl. ¶¶ 18–19, Exs. C & D; Castellanos Decl. ¶¶ 8–10, Exs. A, B & C (emphasis added).) Thus, Brundage agreed more than a dozen times to arbitrate all of her disputes concerning the "sale of any and all products and services" which necessarily includes her Celebrations Passport purchase.

### C.    Anna Garr's Agreement to Arbitrate

Plaintiff Anna Garr made her first purchase on harryanddavid.com from a desktop computer with a credit card using the email address annagarr@gmail.com on April 17, 2020. (Sweeney Decl. ¶ 5.) To do so, she clicked the "PLACE ORDER" button as depicted in the following screenshot representative of the screen presented to her when she made that purchase:



(Sweeney Decl. ¶¶ 6–7.)  By clicking the "PLACE ORDER" button, Garr agreed to be bound by the hyperlinked Terms of Use.

On March 3, 2021, Garr made a purchase on 1800flowers.com that included a Celebrations Passport membership. (Sweeney Decl. ¶ 4.)  Purchasing Celebrations Passport provided benefits to 1-800-Flowers.com's family of brands including cheryls.com, 1800flowers.com, and personalizationmall.com. (SAC ¶¶ 18–19.)  She then made purchases on five separate dates

from 2021 to 2023, and used her Celebrations Passport benefits with three of them before she incurred a Passport renewal fee on March 1, 2022. (Sweeney Decl. ¶¶ 9–10.)

Garr made one such purchase on 1800flowers.com on March 21, 2023, from a desktop computer using a credit card. (Sweeney Decl. ¶ 10.)  To complete her purchase, Garr clicked a button on the checkout page which stated "PLACE ORDER" as reflected on the following screen representative of the screens presented to her at the time of her purchase:



(Sweeney Decl. ¶¶ 10–11.)  By clicking the "PLACE ORDER" button, Garr agreed to be bound by the hyperlinked Terms of Use.

The hyperlinked Terms of Use to which Garr agreed when making her purchases on April 17, 2020, and on March 21, 2023, state in all-caps bold print on the first page:

**PLEASE BE AWARE THAT THESE TERMS OF USE CONTAIN A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER THAT WAIVE YOUR RIGHT TO A COURT HEARING AND JURY TRIAL.**

(Sweeney Decl. ¶¶ 8, 12, Exs. A & B.)  Likewise, the Terms of Use also state in all-caps:

9

THESE TERMS OF USE ALSO APPLY TO ALL MERCHANDING CHANNELS OF THE COMPANY AND ITS AFFILIATES INCLUDING, BUT NOT LIMITED TO, THE INTERNET, TELEPHONE, CATALOG, RADIO, TELEVISION, MOBILE DEVICE, SOCIAL MEDIA AND PARTICIPATING RETAIL STORES. BY ACCESSING ANY OF THE COMPANY MERCHANDING CHANNELS, AND ANY AREAS OF THE SERVICE, YOU AGREE TO BE LEGALLY BOUND, AND TO ABIDE, BY THESE TERM OF USE.

(Sweeney Decl. ¶¶ 8, 12, Exs. A & B.)

And, the Terms of Use Garr assented to contain an arbitration provision virtually identical to the one to which Brundage agreed, which also broadly covers "any and all claims, disputes, controversies, actions or proceedings relating to, or arising out of, the […] sale of any and all products and services of the Company and its Affiliates" as follows:

**Governing Law, Waiver of Jury Trial & Arbitration; CLASS ACTION WAIVER**

. . .

You agree that any and all claims, disputes, controversies, actions or proceedings relating to, or arising out of, the creation, production, manufacture, distribution, promotion, marketing, advertising (including oral and written statements), use of, exploitation, or ***sale of any and all products and services of the Company and its Affiliates, through all merchandising channels***, including, but not limited to, the internet, this Service, telephone, catalog, radio, television, mobile device and participating retail stores or the Content (collectively referred to as "Claims"), shall be governed by the internal substantive laws of the State of New York without regard to its conflict of laws principals and that any and all Claims shall be resolved exclusively by final and binding arbitration administered by the American Arbitration Association ("AAA") [or by a state small claims court of competent jurisdiction over the Claim and the parties.]

(Sweeney Decl. ¶¶ 8, 12, Exs. A & B (emphasis added).)  Thus, Garr twice agreed to arbitrate all of her disputes concerning the "sale of any and all products and services of the Company and its Affiliates" which necessarily includes her Celebrations Passport purchase. (*Id.*)

III.     **THE COURT SHOULD COMPEL PLAINTIFFS TO ARBITRATE**

     A.     **Legal Standard**

Under the Federal Arbitration Act ("FAA"), a written agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 147–48 (2024) (quoting 9 U.S.C. § 2); *Davitashvili v. Grubhub, Inc.*, 131 F.4th 109, 114 (2d Cir. 2025). Courts must therefore "rigorously enforce arbitration agreements according to their terms." *Davitashvili*, 131 F.4th at 115 (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232 (2013)) (citation omitted). Any doubts regarding the applicability of an arbitration agreement "should be resolved in favor of arbitration." *DDK Hotels, LLC v. Williams-Sonoma, Inc.*, 6 F.4th 308, 317 (2d Cir. 2021) (citing *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944–45 (1995)).

In resolving a motion to compel arbitration, the analysis is limited to assessing whether (1) the parties agreed to arbitrate, and (2) the claims fall within the scope of the arbitration agreement. *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022); *Davitashvili*, 131 F.4th at 115. "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman*, 49 F.4th at 10102. To do so, courts apply state-law principles of contract formation. *Davitashvili*, 131 F.4th at 115. Here, New York law applies, and New York State has a "long and strong public policy favoring arbitration." *Wu v. Uber Tech., Inc.*, 43 N.Y.3d 288, 297 (2024). "Once the existence of an agreement to arbitrate is established, the burden shifts to the party seeking to avoid arbitration to 'show the agreement to be inapplicable or invalid.'" *Zachman*, 49 F.4th at 102 (quoting *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010)).

### B.    Plaintiffs Agreed to Arbitrate

A valid arbitration agreement exists with both Bundage and Garr under Second Circuit precedent because plaintiffs had reasonably conspicuous notice of 800-Flowers' Terms of Use. Brundage made dozens of purchases on seventy separate dates on 1800flowers.com, cheryls.com, and personalizationmall.com between 2021 and 2025 – including on four occasions *after* having filed the instant lawsuit and repeatedly using the free shipping benefits from her Celebrations Passport that she now complains about – all of which required her to assent to 800-Flowers' Terms of Use by clicking checkout buttons immediately above hyperlinked Terms of Use. (Sweeney Decl. ¶¶ 14–20; Castellanos Decl. ¶¶ 5–10.)  Garr is similarly bound by the arbitration provision in Terms because she assented to the hyperlinked Terms of Use when she made purchases both before and after her Celebrations Passport purchase. (Sweeney Decl. ¶¶ 5–12.)

In cases involving web-based contracts, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in [a] way that would put her on inquiry notice of such terms." *Davitashvili*, 131 F.4th at 116 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).  "Factors include whether the terms of use are 'spatially coupled' with the checkout button, whether the entire screen is visible at once without scrolling, whether the checkout button is 'temporally coupled' with the hyperlink to the terms of use, and whether the language is clear." *Id.* (citations omitted).

Applying these principles, the Second Circuit recently enforced an arbitration agreement in *Davitashvili v. Grubhub Inc.* finding that Grubhub's web and mobile application interfaces provided reasonable notice of the company's terms. 131 F.4th at 116–17.  The Grubhub mobile and web-based interfaces that the Second Circuit considered are:

*Grubhub Mobile Interface*



*Grubhub Web-Based Interface*



Brief for Defendant-Appellant Grubhub Inc. at 6–8, *Davitashvili v. Grubhub Inc.*, 131 F.4th 109 (2d Cir. May 26, 2023) (No. 23-522, ECF No. 35) (hereinafter, "Grubhub Appellate Brief").

As to the mobile application interface, the court found that (1) the hyperlinked terms "'appear[ed] directly below' the checkout button"; (2) the notice was also "temporally coupled because it [was] presented on the same screen 'at a place and time that the consumer will associate with the initial purchase or enrollment'—that is, on the purchase screen itself"; and (3) that the notice language, "By placing your order, you agree" constituted "a clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms." 131 F.4th at 116 (citing *Meyer*, 868 F.3d at 78–79).

As to the web interface, the court found that consumers were also on notice where the interface was not overly cluttered, had hyperlinks to the terms of use which were both spatially and temporally coupled with the checkout button, and where the notice language also stated "By placing your order, you agree." *Id.* at 116–17.  The court held that "These features, taken together, are enough to provide inquiry notice to a reasonably prudent web user." *Id.* at 117.

The Second Circuit in *Meyer v. Uber* also enforced an online arbitration agreement under circumstances analogous to those here. 868 F.3d at 77–80.  The court explained that the payment screen the plaintiff encountered in Uber's smartphone application was "uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet to the Uber account, and the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY.'" *Id.* at 78.  The court emphasized that this text, "including the hyperlinks to the Terms and Conditions and Privacy Policy, appear[ed] directly below the buttons for registration." *Id.*  In addition, the text was in a "dark print," which "contrast[ed] with the bright white background, and the hyperlinks [were] blue and underlined." *Id.*  The court also emphasized that the relevant notice was not only "spatially coupled," but also "temporally coupled." *Id.*  Because "notice of the Terms of Service [was] provided simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply," the court held that "a reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account." *Id.*  In this context, the user's choice to create an account meant that he "unambiguously manifested his assent to Uber's Terms of Service," including the governing arbitration clause. *Id.* at 80.

Other cases are in accord.  In *Starke v. Gilt Groupe, Inc.*, No. 13 CIV. 5497 LLS, 2014 WL 1652225 (S.D.N.Y. Apr. 24, 2014), the court held under New York law that a customer who

"clicked 'Shop Now,'" and "was informed that by doing so, and giving his email address, '[he] agree[d] to the Terms of Membership for all Gilt Groupe sites'" was subject to the arbitration agreement contained in the Terms of Membership. *Id.* at *3. The court held that "[r]egardless of whether he actually read the contract's terms, [the plaintiff] was directed exactly where to click in order to review those terms, and his decision to click the 'Shop Now' button represents his assent to them." *Id.*; *see also Himber v. Live Nation Worldwide, Inc.*, No. 16-CV-5001(JS) (GRB), 2018 WL 2304770, at *3 (E.D.N.Y. May 21, 2018) ("[T]he offeree will […] be bound by the agreement if a reasonably prudent user would be on inquiry notice of the terms.").

Here, like in *Davitashvili*, *Meyer*, and the other cases cited above, a reasonable user would have been able to see the notice and locate the terms of use. *Davitashvili*, 131 F.4th at 116–17; *Meyer*, 868 F.3d at 78–79. Indeed, the Grubhub interfaces and notice text, placement, and presentation the court held provided reasonably conspicuous notice to consumers in *Davitashvili* are materially identical to the interfaces and notices Brundage and Garr viewed when making purchases across 800-Flowers' websites. (Sweeney Decl. ¶¶ 6, 10, 16; Castellanos Decl. ¶ 5); *accord* Grubhub Appellate Brief at 7–8. The screens are all "'uncluttered' with only a few items, such as fields for registration or payment information and the notice and hyperlinked terms," and without "extraneous information, unrelated hyperlinks, text displayed in various font sizes and colors, or multiple buttons and promotional advertisements." *Hu v. Whaleco, Inc.*, 779 F. Supp. 3d 265, 285–86 (E.D.N.Y. 2024) (citations omitted) ("The Second Circuit has not held that an 'uncluttered' interface must be free of 'promotions' or 'extraneous information,' […] but rather has explained that an uncluttered interface 'does not include a *plethora* of clutter or extraneous information.'" (quoting *Edmundson v. Klarna, Inc.*, 85 F.4th 695, 706 (2d Cir. 2023) (emphasis in original))); (*see* Sweeney Decl. ¶¶ 6–7, 10–11, 16–17; Castellanos Decl. ¶¶ 5–6).

Further, both notice and the hyperlinked Terms are conspicuous in all the screens.  To place their purchases, Brundage and Garr clicked large buttons labeled "PLACE ORDER," "PayPal," or "Place Your Order." (Sweeney Decl. ¶¶ 6–7, 10–11, 16–17; Castellanos Decl. ¶¶ 5–6.)  Text immediately below these buttons informed plaintiffs that by clicking the buttons they agreed to be bound by 800-Flowers's Terms of Use, and each iteration of that text featured a hyperlink to the Terms of Use, which were underscored and distinguished in bright blue font or underlined in dark grey font. (Sweeney Decl. ¶¶ 6, 8, 10, 12, 16, 18–19; Castellanos Decl. ¶¶ 5, 8–10.)

When Garr made her April 17, 2020, purchase, the text immediately below the "PLACE ORDER" button stated: "By clicking the "Place Order" button I agree to be bound by the **Terms of Use** and **Privacy Notice**." (Sweeney Decl. ¶¶ 6–7.)  When she made her March 21, 2023, purchase, she also clicked "PLACE ORDER," which was immediately adjacent to text stating: "By tapping or clicking the "Place Order" button I agree to be bound by the **Terms of Use** and **Privacy Notice**." (Sweeney Decl. ¶¶ 10–11.)

The same applies to Brundage's purchases.  When Brundage made her two purchases on cheryls.com, she clicked a "PayPal" button immediately above text stating: "When you click on the PayPal button, you are agreeing to the **Privacy Notice** and **Terms of Use**." (Sweeney Decl. ¶¶ 16, 18.)  Likewise, when making her twelve transactions on personalizationmall.com, Brundage clicked a "Place Your Order" button, and the text immediately below that button stated: "By clicking the "Place Your Order" button I agree to be bound by the Terms of Use and Privacy Notice." (Castellanos Decl. ¶¶ 5, 8–10.)

Accordingly, the "notice and hyperlinked terms are conspicuous in light of the whole web page, particularly given the capitalization, bolding, underlining, sizing, and font choice." *Edmundson*, 85 F.4th at 706 (finding hyperlink to terms was conspicuous because although "in a

smaller font relative to other text" on the interface, "they are set apart from surrounding information by being underlined and in a color that stands in sharp contrast to the color of the interfaces' backgrounds"); *Vasell v. SeatGeek, Inc.*, No. 24-CV-00932 (NCM) (JRC), 2025 WL 240912, at *6 (E.D.N.Y. Jan. 17, 2025) ("[T]he account sign-up page displayed distinct grey text, an uncluttered layout, and underlined hyperlinks to the TOU providing similarly conspicuous notice that, by clicking the "Sign up" button, the user also agreed to the TOU." (citing *Meyer*, 868 F.3d at 78–79)).  The notice and hyperlinked terms are also "spatially coupled" with checkout buttons in each screen. (Sweeney Decl. ¶¶ 6–7, 10–11, 16–17; Castellanos Decl. ¶¶ 5–6); *Edmundson*, 85 F.4th at 706 ("Spatially, the hyperlink to [the] terms appears directly adjacent to the button intended to manifest assent to the terms." (cleaned up)).

Further, the terms are "temporally coupled" with the mechanism for manifesting assent because, as in *Davitashvili*, the notice is "presented on the same screen 'at a place and time that the consumer will associate with the initial purchase or enrollment'—that is, on the purchase screen itself." *Davitashvili*, 131 F.4th at 116 (quoting *Meyer*, 868 F.3d at 79).  And, similar to the *Meyer* and *Davitashvili* notice language, the notices here constitute "a clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of [purchase] would be subject to contractual terms." *Id.* at 116 (citing *Meyer*, 868 F.3d at 78-79).

"These features, taken together, are enough to provide inquiry notice to a reasonably prudent web user." *Id.* at 117.  Therefore, a valid agreement to arbitrate exists between 800-Flowers and both Brundage and Garr.

C.    **Brundage's and Garr's Claims Fall Squarely Within the Arbitration Agreement's Scope**

When an agreement contains an arbitration clause, a presumption of arbitrability applies, and doubts regarding whether the arbitration clause applies to the particular claims at issue should

be resolved in favor of arbitration. *AT&T Tech. v. Commc'n Workers*, 475 U.S. 643, 650 (1986). This mandate applies with even greater force where, as is here, the arbitration clause is broad. *Id.*; *Collins & Aikman Prods. Co. v. Building Sys.*, 58 F.3d 16, 20 (2d Cir. 1995) (characterizing a clause which dictated submission to arbitration of "[a]ny claim or controversy arising out of or relating to th[e] agreement" as the "paradigm of a broad clause").

For example, arbitration clauses that apply to claims "arising out of" the agreement are considered broad provisions. *Shaw Grp., Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) (agreement requiring arbitration of "all disputes concerning or arising out of" an agreement is a "broad grant of power to the arbitrators" and is "evidence [of] the parties' clear 'intent to arbitrate issues of arbitrability'"). The presumption in favor of arbitration applies unless it is rebutted by the agreement's language. *See Fujifilm N. Am. Corp. v. Geleshmall Enters, LLC*, 239 F. Supp. 3d 640, 648 (E.D.N.Y. 2017).

Further, "[t]he Second Circuit has held that, in the absence of language explicitly limiting an otherwise broad arbitration agreement to post-agreement disputes, the agreement should be deemed retroactive." *Schapp v. MasTec Servs. Co.*, No. 6:12-CV-841 (LEK/DEP), 2014 WL 1311937, at *3 (N.D.N.Y. Mar. 31. 2014) (citing *Coenen v. R.W. Pressprich & Co.*, 453 F.2d 1209, 1212 (2d Cir. 1972)) ("Here, the Policy applies broadly to *'any* dispute arising out of or relating to Plaintiffs' employment' and contains no temporally limiting language. […] The Court therefore finds that the Policy applies retroactively to Plaintiffs' claims against Halsted." (emphasis in original)); *see also Vasell*, 2025 WL 240912, at *7 ("Arbitration clauses with similarly broad terms covering 'any dispute, claim or controversy' have been given retroactive effect in this Circuit." (citation omitted)); *Ryan, Beck & Co. v. Fakih*, 268 F. Supp. 2d 210, 224 n. 28 (E.D.N.Y. 2003) ("[W]here, as here, the arbitration clause did not contain any temporal limitation, the Second

Circuit has compelled arbitration despite the fact that the challenged conduct predated the signing of the parties' agreement." (quotation omitted)).

Applying these standards here, Brundage's and Garr's claims fall within the scope of the arbitration provision contained within 800-Flowers' Terms of Use because the Terms applicable to Brundage's seventy transactions and to Garr's purchases all contain a broad arbitration provision and are devoid of language limiting the provision to post-agreement disputes.

*First*, Brundage and Garr agreed to arbitrate "any and all claims, disputes, controversies, actions or proceedings relating to, or arising out of, the creation, production, manufacture, distribution, promotion, marketing, advertising (including oral and written statements), use of, exploitation, or sale of any and all products and services of the Company and its Affiliates, through all merchandising channels," including on 800-Flowers' websites. (Sweeney Decl. ¶¶ 8, 12, 18–19, Exs. A–D; Castellanos Decl. ¶¶ 8–10, Exs. A–C.)  This broad provision includes Brundage's and Garr's claims at issue in this lawsuit because those claims arise out of 800-Flowers' "sale of" its Celebrations Passport to Brundage and Garr and 800-Flowers' "distribution, promotion, marketing, [and] advertising" of the renewal policy for its Celebrations Passport service. (Sweeney Decl. ¶¶ 8, 12, 18–19, Exs. A–D; Castellanos Decl. ¶¶ 8–10, Exs. A–C); *see Bellevue v. Exxon Mobile Corp.*, No. 19-cv-652 (BMC) (LB), 2019 WL 1459041, at *3 (E.D.N.Y. Apr. 2, 2019) (compelling arbitration and noting that an arbitration provision covering "any claim, dispute or controversy" was "as broad as lawyers could make it").

*Second*, 800-Flowers' Terms of Use do not limit the arbitration provision to post-agreement disputes.  And, in accord with Second Circuit precedent, courts have compelled arbitration where the plaintiff's initial purchase occurred before the plaintiff was presented with an arbitration agreement.  In *Bassett v. Elec. Arts Inc.*, No. 13-CV-04208 MKBSMG, 2015 WL

20

1298644 (E.D.N.Y. Feb. 9, 2015), *report and recommendation adopted*, 93 F. Supp. 3d 95 (E.D.N.Y. 2015), for example, the plaintiff purchased the video games at issue in the lawsuit in stores over a period of three years, before eventually registering his purchases to access the online features of defendant's games. *Id.* at *1. The registration process required users to assent to the defendant's terms, which included a broad arbitration provision. *Id.* The plaintiff argued that the registration terms "entered into later and only after the purchases were made and the transaction completed, were far removed from the purchase itself and the product packaging […] and thus may not override or govern the initial contract formed between the parties at the time of purchase." *Id.* at *4. The court disagreed, finding that it was not "determinative that plaintiff Bassett did not register, and thereby agree to arbitrate, until after completing his purchases of defendant's products" because "[t]he arbitration agreement at issue contains express language placing 'any and all disputes' between the user and defendant within its scope, thus including by its terms even disputes involving previously purchased products." *Id.* at *5. The court further explained that plaintiff had the opportunity to familiarize himself with the registration terms before purchasing any of the games and when purchasing several games over a three-year period. *Id.* Indeed, the court found that the plaintiff:

> undoubtedly registered some of the first products he acquired before making his more recent purchases, and by this means as well had the opportunity before making all but his earliest purchases to become fully familiar with defendant's terms of service and the fact that they would be presented only when registering an already purchased game for online access.

*Id.* at *2.

But even if there were doubts regarding the applicability of the arbitration provision to their claims, any such doubts must be resolved in favor of arbitration. *AT&T Techs.*, 475 U.S. at 650. Where the presumption of arbitrability applies, as here, the court must compel arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an

interpretation that covers the asserted dispute." *Id.* No such positive assurance exists here where the arbitration provision is both broad and unrebutted by its own contractual language.

Therefore, because valid, binding arbitration agreements exists between 800-Flowers and Brundage and Garr, respectively, which cover their claims at issue in this case, the Court should compel them to arbitrate their claims.

## IV.    THE COURT SHOULD STAY THIS ACTION PENDING RESOLUTION OF THE ARBITRATION

Section 3 of the FAA, entitled "Stay of proceedings where issue therein referable to arbitration," states that where "any issue in a suit is subject to arbitration, the court '*shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.'" *Smith v. Spizziri*, 601 U.S. 472, 476 (2024) (quoting 9 U.S.C. § 3) (emphasis added). Therefore, "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Id.* at 478.

Accordingly, the Court should stay this action pending the resolution of arbitration if the Court finds, as shown herein, that plaintiffs agreed to arbitrate their claims.

## V.    ALTERNATIVELY, THE COURT SHOULD STRIKE THE CLASS CLAIMS

Alternatively, the Court should strike plaintiffs' class claims because plaintiffs have unambiguously waived their ability to assert their putative class claims, whether in court or in arbitration. Indeed, the Terms of Use to which Brundage and Garr agreed expressly preclude them from pursuing class claims:

> **YOU SHALL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY, OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION[.]**

(Sweeney Decl. ¶¶ 8, 12, 18–19, Exs. A–D; Castellanos Decl. ¶¶ 8–10, Exs. A–C.)

Accordingly, the Court should strike Brundage's and Garr's class allegations or otherwise preclude them from pursuing class relief. *Vitrano v. N.A.R., Inc.*, No. 18CV06754KAMRLM, 2020 WL 1493620, at *9 (E.D.N.Y. Mar. 27, 2020) (finding "[c]lass action waiver[s …] valid and enforceable" and granting defendant's motion to strike class claims); *Castellanos v. Raymours Furniture Co., Inc.*, 291 F. Supp. 3d 294, 302 (E.D.N.Y. 2018) (compelling arbitration on an individual basis, because "[b]inding Second Circuit precedent requires the Court to enforce the [agreement's] class action waiver"); *Camilo v. Uber Techs., Inc.*, No. 17 CIV. 9508 (AKH), 2018 WL 2464507, at *3 (S.D.N.Y. May 31, 2018) (on motion to compel arbitration and strike class claims, finding that "the class action waiver […] is valid and enforceable, and […] grant[ing] Defendants motion to strike the class allegations" before compelling arbitration); *Tsadilas v. Providian Nat'l Bank*, 786 N.Y.S.2d 478, 480 (N.Y. App. Div. 1st Dep't 2004) ("The arbitration provision is enforceable even though it waives plaintiff's right to bring a class action.").

And, even if the Court finds the arbitration provision unenforceable for some reason, it should still strike plaintiffs' class allegations, as the class action waiver is severable from the arbitration provision and the Terms contain a severability clause:

> If any term or other provision of these Terms of Use are deemed by a final court of competent jurisdiction to be invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other terms, conditions and provisions of these Terms of Use shall nevertheless remain in full force and effect to the maximum extent permitted by law. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the court shall modify only the affected term, condition or provision to effect the original intent of the parties as closely as possible so that the contemplated transactions are fulfilled and the Company and its Affiliates are protected to the greatest extent possible.

(Sweeney Decl. ¶¶ 8, 12, 18–19, Exs. A–D; Castellanos Decl. ¶¶ 8–10, Exs. A–C.)

## VI.    <u>CONCLUSION</u>

For any and all of these reasons, the Court should compel plaintiffs to arbitrate their claims against 800-Flowers and stay this litigation pending the outcome of the arbitrations.  Alternatively, the Court should strike plaintiffs' class claims.

Dated:  September 15, 2025                          Respectfully submitted,

*/s/ Ari N. Rothman*
Ari N. Rothman (*pro hac vice*)
VENABLE LLP
600 Massachusetts Avenue, N.W.
Washington, DC 20001
(202) 344-4220
anrothman@venable.com

John C. Vazquez
VENABLE LLP
151 W 42nd Street
New York, NY 10036
jcvazquez@venable.com
(212) 307-6293

*Attorneys for 800-Flowers, Inc.*

## <u>WORD COUNT CERTIFICATION</u>

I hereby certify pursuant to Section VI.A. of the Court's Individual Practices for Civil and Criminal Cases that the total number of words in this Motion is 6,168.

*/s/ Ari N. Rothman*
Ari N. Rothman